**GUARINO & CO. LAW FIRM, LLC**
26 Park Street, Suite 2057
Montclair, NJ 07042
973/509-4628
guarinolaw@gmail.com
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LISA KAROON AND MANICKAM GANESH, individually and on behalf of a class comprised of common stock shareholders of VIRNETX, <br><br> Plaintiffs, <br><br> v. <br><br> JOHN DOE COMPANIES 1 through 100, <br><br> Defendants. | Civil Action No. 17-cv-00034 <br><br> **FIRST AMENDED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Lisa Karoon and Manickam Ganesh, on behalf of themselves and all others similarly situated, and demanding a trial by jury, through the undersigned attorneys bring this Class Action seeking redress for the illegal practices of John Doe Company defendants 1 through 100 (collectively, "Defendants"), and allege:

**NATURE OF SUIT**

1. The Defendant John Doe Companies are "prime brokers" who provide prime brokerage services and securities lending, and who each hold a large aggregate amount of client assets in the prime brokerage market.

2. These prime brokers engaged in a pattern or racketeering activity involving securities violations, and in other wrongful conduct. The prime broker defendants have

engaged in a massive scheme in which they have continuously, and for years, illegally executed "naked short sales" of the stock of publicly-traded VirnetX with no intention of delivering stock to settle the short sales. Instead, these prime brokers have intentionally failed to deliver VirnetX stock to settle the short positions so as to reap huge profits and ingratiate themselves to their hedge fund and corporate clients.

3. In addition, these prime brokers have "painted the tape." They have manipulated the market and fixed the price of VirnetX stock through massive "dumping" of VirnetX shares at key moments, all so as to create negative market sentiment, a "piling" of short sales, and depression of the price of the stock so as to further their own short sale strategies and those of their hedge fund and corporate clients.

4. Defendants' actions have caused and continue to cause dramatic distortions with regard to the nature and amount of trading in VirnetX stock, which have caused its share price to drop drastically from some $35.00 per share to some $5.70, despite the market's upward movement; despite what had been an expected rise of the VirnetX shares to a projected $60 range; and despite the fact that VirnetX has been awarded some $400 million in patent litigation against Apple and can expect an award of ongoing royalties and further relief.

**PARTIES**

5. Plaintiff Lisa Karoon resides at 712 Linwood Avenue, Ridgewood, New Jersey 07450. At all relevant times, she was a shareholder of VirnetX, a company

traded on the New York Stock Exchange under the symbol VHC.  She brings this action individually, and as a representative of the putative Class.

6.  Plaintiff Manickam Ganesh resides at 5 Eccelston Court, Montville, NJ  07045. At all relevant times, he was a shareholder of VirnctX, a company traded on the New York Stock Exchange under the symbol VHC.  He brings this action individually. and as a representative or the putative Class.

7.  John Doe Companies 1-100 are certain prime brokers and others whose identities are as yet unknown and who were involved in the pernicious, illegal conduct complained of *infra.*  The identity of the John Doe companies can be, and will be, ascertained by subpoenaing information from various exchanges.  Upon identifying such prime brokers and others through discovery, the complaint will be amended to specifically name them.

## VIRNETX' BUSINESS

8.   VirnetX was founded by former engineers and executives from Science Applications International Corporation, which developed security technology for the Department of Defense, the Department of Homeland Security, the CIA, and other federal agencies.  VirnetX has developed core patentable internet security technologies which automates secure LTE communications, and it holds over 100 related patents that have either been granted or are pending.  It is a leader in mobile security technology.

9.  Since 2010 VirnetX has been in litigation with Apple, Cisco, Microsoft (since 2007) and others over alleged patent infringement by these companies. VirnetX settled with Microsoft in August of 2010 for $210 million and December of 2014 for an additional $23 million concerning patent disputes over Skype technology, and in VirnetX's suit against Apple VirnetX ultimately was awardd

over $400 million in damages for patent infringement. An award of ongoing, future royalties to be paid VirnetX by Apple and further relief can be expected.

## DEFENDANTS' MARKET MANIPULATION

10.   Defendants collectively control a huge percentage of the prime brokerage market. They act as settlement agents, providing custody for assets and financing for their clients who arc hedge funds, money managers, market makers, arbitrageurs, specialists, and other professional investors.  As SROs (Self Regulatory Organizations), Defendants hold themselves out as assuring the proper accounting and settlement of stock trades, including short sales, and as providing most of the lending of securities in the marketplace that settles short sales.

11.   Many of the Defendants' unlawful acts and/or omissions are currently known only by them and are contained in documents and electronic records which they and/or the stock exchanges exclusively possess, control and maintain. Nevertheless, plaintiffs are aware of certain  facts and circumstances which clearly demonstrate a pattern of unlawful, illegal conduct and racketeering activity.

## A. Illegal Naked Short Selling

12.   A short sale consists of the sale of a stock that the seller does not own and that the seller normally has to borrow for delivery on or before the trade settlement date.  The seller speculates that the price of the stock will go down so that. if the price of the stock in fact drops, the short seller is able to profit from the drop in price (less associated transaction costs) after buying replacement shares to pay back the loan.

13.   When a person short sells a stock, the person normally borrows the stock and warrants to the stock lender (the broker-dealer) that the loan will be covered with shares purchased at a later date. The borrowed stock either comes from the broker-dealer's inventory, from the margin account of the broker-dealer's other clients, or from another lender, and the broker-dealer charges interest on the loan. In short, the brokers promise to locate shares of the shorted stock, borrow the stock, and deliver it. For this the brokers charge a fee to the short sellers.

14.   Defendants, as prime brokers, play an integral role in short sale securities transactions; among other things, they are responsible for locating the shares of the shorted stock, borrowing the stock certificates, and delivering shares by the settlement date when sold short.

15.   Short selling is legal and is an accepted trading strategy, so long as the short seller first makes an affirmative or reasonable determination that the shorted shares are available and the broker-dealer actually owns, borrows or otherwise obtains the stock it sells short by the settlement date.

16.   If the Defendants accomodate a short sale but then fail to deliver the shares of the shorted stock by the settlement date, there is a "fail-to-deliver" and the sale becomes a "naked short sale." In such event, the sale to the buyer occurs, but it is of phantom or counterfeit shares because no real shares were ever delivered by the offending broker-dealer.

17.  Naked short selling currently destabilizes and depresses a company's share price because it removes any real and official supply constraint on stock sales. An unlimited supply of any commodity, including company stock, places a downward pressure on the price of that commodity. Naked short selling exacerbates volatility in the securities markets and damages company shareholders. because it floods the market with unauthorized, fictitious/counterfeit shares or entitlements, thereby diluting the value of each legitimate share of stock, diluting the shareholder's right to a fixed percentage or ownership of the company, and diluting the shareholder's voting rights. Naked short selling is intended to deliberately depress the price of a security in order to maximize the profit that is made on the difference between the price of the stock when it was sold and the price of the stock that is required lo be delivered on the settlement date. Naked short selling often is also used as a tool as part of the market manipulation of a company's stock price, as alleged *infra* as concerns VirnetX.

18.  The harder it is for a broker-dealer to borrow stock, the higher the borrowing fee. Hence, when an illiquid stock is shorted, it tells the market that sellers are shorting the stock even though they have to pay borrowing fees as high as 60-70% annualized and therefore factor in this steep cost in deciding to bet against the stock—a sign to the market that there is good reason to short and an expression of genuine negative market sentiment. When the market- maker's client does not have to obtain the share certificates and pay the borrowing fee to short the sale because the short sale is a concealed naked short sale, the market is distorted and manipulated.

19. In a naked short sale of VirnetX stock, the short seller has effectively created and conveyed unauthorized, fictitious and phantom shares of VirnetX stock to the buyer. because the buyer is credited with owning synthetic shares that did not previously exist. The newly created VirnetX shares are counterfeit shares, because they were never authorized or issued by VirnetX or registered for sale by VirnetX with either the SEC or the market exchange on which the shares trade. Such unauthorized, counterfeit shares arc created electronically by the short seller market makers through an illegal short sale of a stock that the short seller did not own, deliver and/or intend on possessing in order to complete the settlement of the short sale.

20. The Securities and Exchange Commission ("SEC") has opined as to the pernicious effects of naked short selling on the securities markets:

> [W]e are concerned that large and persistent fails to deliver may have a negative effect on the market in these securities. For example, large and persistent fails to deliver may deprive shareholders of the benefits of ownership. such as voting and lending. In addition, where a seller of securities fails to deliver securities on trade settlement date, in effect the seller unilaterally converts a securities contract (which should settle within the standard 3-day settlement period) into an undated futures-type contract, to which the buyer may not have agreed, or that may have been priced differently. Moreover, sellers that fail to deliver securities on trade settlement date may enjoy fewer restrictions than if they were required to deliver the securities within a reasonable period of time. and such sellers may attempt to use this additional freedom to engage in trading activities that deliberately and improperly depress the price of a security.
>
> In addition, many issuers and investors continue to express concern about extended fails to deliver in connection with 'naked' short selling. To the extent that large and persistent fails to deliver might be indicative of manipulative 'naked' short selling, which could be used as a tool to drive down a company's stock price, fails to deliver may undermine the confidence of investors. These investors, in turn, may be reluctant to commit capital to an issuer they believe to be subject to such manipulative conduct. In addition, issuers may believe that they have suffered unwarranted reputational damage due to investors' negative perceptions regarding large and persistent fails to deliver. Any unwarranted reputational

damage caused by large and persistent fails to deliver might have an adverse impact on the security's price.

21. In November of 2007, former SEC Chairman Harvey Pitt commented on naked short selling by stating: "Phantom shares created by naked shorting are analogous to counterfeit money." Senator Robert Bennet, during a February 14, 2008 Senate Banking Committee Hearing, affirmed that because of naked short selling it is "increasingly ... easier in this electronic world to give you counterfeit shares." The SEC has expressly opined that selling stock short and failing to deliver shares at the time of settlement with the purpose of driving down the security's price constitutes a "manipulative activity" that "in general would violate various securities laws." *See* www.sec.gov/spotlight/keyregshoissues.htm; *see also* SEC Release No. 34-.57511, p.3, File No. S7-08-08 (Mar. 7, 2008).

22. Because of the pernicious effects of naked short selling as described by the SEC, in 2005, and in response to pervasive manipulative conduct in the unlawful naked short selling of securities, the SEC adopted Regulation SHO, 17 C.F.R. § 242.204. Its general purpose is to establish uniform "Locate" and "Close-Out" requirements and prevent unlawful naked short selling, in which market participants sought to obtain illicit profits by selling or loaning stock at artificially depressed prices that they did not own, and that they never intended to borrow or locate for delivery to buyers so as to close-out and settle their trades.

23. The SEC also has promulgated Rule 203, 17 C.F.R. § 242.203, dealing with short sales. Rule 203(b) provides that a broker-dealer cannot accept a short sale order unless it has "[b]orrowed the security, or entered into a bona-fide

arrangement to borrow the security, or has "[r]easonable grounds to believe that the security can be borrowed so that it can be delivered on the date delivery is due."

24. Given Regulation SHO and Rule 203, naked short sales and the acceptance of naked short sale orders are illegal under Section 10 of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, which is aimed at preventing manipulative and deceptive devices. That section provides, in relevant part, that it is unlawful to effectuate a short sale in connection with the purchase or sale of any security in contravention of rules and regulations promulgated by the SEC "by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange." The naked short sales engaged in by Defendants violated SEC Regulation SHO and Rule 203, and are illegal under Section 10.

25. Federal regulations and laws have not diminished brokers' insatiable appetite for illicit profits. Indeed, they have often been fined millions of dollars by FINRA in connection with short sales. As but a small example of the fines imposed:

- Merrill Lynch was filed $6 Million by FINRA on or about October 27, 2014 for violating Regulation SHO governing short sales from September of 2008 through July of 2012 by not closing out certain fail-to-deliver positions, and for not having systems and procedures in place to address Regulation SHO's close-out requirements. Moreover, from September 2008 through March 2011 Merrill Lynch matched fail-to-deliver positions to clients based solely on a client's short position, without regard to which client caused or contributed to the fail-to-deliver position. *See* FINRA News Release, annexed as **Exhibit A.**

- Credit Suisse was fined $1.75 million by FINRA on or about December 27, 2011 for violating Regulation SHO governing short

sales. From June 2006 through December 20l0 Credit Suisse "released millions of short sale orders to the market without locates, including threshold and hard to borrow securities." It also mismarked tens of thousands of sale orders, marking them long instead or short. *See* FINRA News Release, annexed as **Exhibit B.**

- Goldman Sachs and Merrill Lynch were fined $1 million by FINRA on or about June 4.2014 for having failed to provide complete and accurate information about trades. Such data is used by regulators to "identify trading anomalies and investigate potential insider trading or other market manipulations." *See* FINRA News Release, annexed as **Exhibit** C.

- Goldman Sachs was fined $1.8 million by FINRA on or about July 27, 2015 for having failed to provide accurate data over a period or eight years, and for having failed over a period of seven years to submit required trade reports to FINRA. Such data "is integral to FINRA's automated market surveillance program to detect manipulative activity and other potential violation of FINRA rules and federal securities laws." *See* FINRA News Release. annexed as **Exhibit D.**

- Ameritrade was fined $1.8 million by FINRA on or about November 6, 2013 for failing to have reported, or accurately reported, approximately 1.4 million large options positions involving accounts trading in concert from May 2007 through January, 2010. *See* FINRA News Release, annexed as **Exhibit E.**

- Ameritrade was fined and consented to allegations brought by FINRA, in or about October 1, 2008, in which Ameritrade was alleged to have engaged in naked short sales on 580 occasions between May 1, 2005 and August 31, 2005. *See* financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 20050020401-0, annexed as **Exhibit F.**

- Merrill Lynch, on or about November l8, 2013, was fined and consented to allegations brought by FINRA that, *inter alia,* it failed to properly report to FINRA 552 short sale transactions resulting from 13 orders. Among other things, Merrill Lynch failed to mark certain orders as short, and incorrectly classified orders as "covered." *See* financial Industry Regulatory Authority Letter of Acceptance, Waiver and Consent No. 20090l69999-01, annexed as **Exhibit G.**

- Merrill Lynch, on or about December l2, 2012, was fined and consented to allegations brought by FINRA that in l8 instances

from April 1, 2007 through June 30, 2007 the firm failed to indicate in reports submitted to FINRA that the transactions were short sales. Also, from January 1, 2008 through February 7, 2010, the firm executed 8,290,898 cross transactions that were also short sales, without indicating that they were short sales. *See* financial Industry Regulatory Authority Letter of Acceptance. Waiver and Consent No. 20080132132-01, annexed as **Exhibit H.**

26. Defendants have been able to disguise much of their naked short selling and that of their hedge fund and corporate clients, in part, because of their relationship with the Depository Trust and Clearing Corporation and its primary subsidiary, National Securities Clearing Corporation (collectively, "DTCC"). The DTCC is a powerful unregulated corporate institution that monopolizes the clearance and settlement of all United States securities transactions. Since 1999, the DTCC has controlled virtually all of the U.S. trade clearance and settlement processing or stock issued by corporations that is held in brokerage accounts. Most securities trades today are conducted electronically through the DTCC via electronic book entries (rather than the physical transfer of stock certificates).

27. In 1981, to facilitate securities trading, the DTCC created the DTCC stock borrow program which created a massive lending pool of shares from brokers' client margin accounts (*i.e.,* brokerage accounts in which the broker lends the customer cash to purchase securities, which is securitized by both securities and cash). In a proper short sale, a prime broker selling a stock may borrow the stock from the DTCC pool, but then must replace the stock it owes the DTCC; in a naked short sale, the borrowed stock is never actually delivered or returned to the DTCC to settle short sale transactions.

28.   The Defendants have significant involvement, communication with and influence over the DTCC.  For example. they act as DTCC member clearing firms, meaning that they are informed by the DTCC of the clearing and settling of trades so that they can purportedly assure that paperwork associated with the securities transactions is accurate. While the DTCC may not have the authority to regulate short selling, it could create computer programs that would track share holdings to determine if they are real shares or simply entitlements.  The DTCC chooses not to monitor these transactions more closely, because it earns interest on the loaning of these shares—whether they are legitimate or phantom/counterfeit.   In part because or their relationship with the DTCC and their conducting and participating in the DTCC's affairs, Defendants have been able to camouflage their naked short sale activity.

29.   Defendants have been naked short selling shares or VirnetX stock for their own account and/or that of their hedge fund and corporate clients since approximately February 1, 2013, if not earlier.

30.   As but a few recent examples of defendants' naked short selling, VirnetX stock has been on the SHO list on the following days:

12/09/16 on SHO list
12/12/16 on SHO List
12/13/16 on SHO List
12/14/16 on SHO list
03/23/17 on SHO list
05/04/17 on SHO list
06/14/17 on SHO list
06/29/17 on SHO list
07/17/17 on SHO list
08/11/17 on SHO list
08/15/17 on SHO list
10/13/17 on SHO list
10/16/17 on SHO list
10/17/17 on SHO list

10/18/17 on SHO list
10/19/17 on SHO list
10/20/17 on SHO list

    31. VirnetX has complained to the SEC about this illegal activity.  On March 5,

2016, Greg Wood, a Vice-President or VirnetX. e-mailed the SEC as follows:

> **From:** Greg Wood
> **Sent:** Tuesday. March 15, 2016 2:58 PM
> **To:** 'PerilloM@SEC.gov'
> Cc: Kendall Larsen
> **Subject:** VirnetX (VJ-lC) Back on the Sl-lO List
>
> Dear Ms. Perillo.
>
> Thank you for your email on 3/11/16.
>
> First and foremost, I would like to thank you for your diligent actions on our behalf.
>
>     Last year, through your intervention, the Reverse Conversion (practice or creating synthetic/air shares via the options markets to be sold at the market) has effectively stopped.
>
>     Our stock has not appeared on the SHO (naked-short list) since our email to you on 2/23/16 *except we went back on it today.*
>
> So, as being back on the SHO list illustrates, the manipulation of our stock continues.  I receive a tremendous amount of complaints  from our shareholders on a daily basis and I feel compelled to bring this to your attention.
>
> The active market makers have essentially cornered this small company's stock, and through their trading back and forth with each other, they have managed to bring VHC down 23 out of the last 27 trading days (on February 4th we had a historic win against Apple in which a jury awarded us $625 million), regardless of the stock market's upward move.
>
> We request a quick look at the main market-makers' activities (especially the ones most active in daily trading) and practices.  Through your able agency, I believe we can help restore the trust back into our shareholders. Additionally, we stand by to assist  in any way we can.
>
> Best regards,
>
> Greg Wood

> Vice President, Corporate Communications
> VirnetX Holding Corporation (NYSE Arnex:
> VHC) Mobile 415.505.0456 | Office 775.548.1785

On March 16, 2016, Mr. Wood again e-mailed the SEC:

> From: Greg Wood
> Sent: Wednesday, March 6, 2016 7:56 AM
> To: 'Perillo, Michele'
> Cc: Kendal l Larsen
> Subject: RE: SHO List Again Today
>
> Ms. Perillo,
>
> Please see screen shot taken a few minutes ago showing VHC on the SHO list or the threshold securities list.
>
> Thank you,
> Greg Wood

32. Defendants' persistent failures to deliver have created immense downward pressure on the price of VirnetX's stock by creating a virtually unlimited supply of that stock for sale. Indeed, the price of VirnetX stock tumbled from $35.23 per share on February 1, 2013 to but $3.20 per share on November 25. 2016, even though the market has moved upward and VirnetX has had great success in its litigation against Apple, in that VirnetX has been awarded some $400 million in patent litigation against Apple and can expect an award of ongoing royalties and further relief.

33. Defendants traded in their own proprietary accounts and/or allowed their hedge fund and corporate clients to complete naked short sales—either standing alone or as part of Reverse Conversions (short selling stock and hedging the position by buying its call option and selling its put option; whether the

brokerage firm makes money depends on the borrowing cost of the shorted stock (zero when a naked short sale is involved) and the put and call premiums) or other complex trading strategies—at times when Defendants neither possessed nor had any intention of obtaining sufficient authorized stock to cover these transactions.

34. Many of Defendants' "fails-to-deliver.. may have been effectuated in subsidiaries created by Defendants (subsidiaries who sold shares to Defendants), in an attempt to avoid implicating Defendants in these illegal transactions and so as to create a supply of phantom shares for Defendants to thereafter short. Defendants especially would knowingly use such subsidiaries to fail "negative rebate trades," meaning trades that would have cost Defendants money because to effectuate them legally they would have had to have borrowed the stock from other broker-dealers or the DTCC.

35. Defendants' conduct facilitated naked short sales and decreased their cost by eliminating the need for a Defendant to actually locate and borrow VirnetX shares in conjunction with a short sale.

36. Defendants had great motivation to engage in naked short selling. Apart from large fees, commissions and interest that they charged, the ability and willingness of Defendants to engage in naked short selling enhanced their competitiveness with hedge fund and corporate clients, who wanted to manipulate the market and depress the price of VirnetX stock and engage in naked short selling so as to avoid hefty fees associated with having to actually borrow stock from other

15

broker-dealers or the DTCC to settle short sales—fees in addition to those always

tacked on and charged by the broker-dealer. Moreover, some hedge fund and

corporate clients were "non-paying," meaning that in negative rebate trades/short

sales where the Defendants would have had to pay to borrow stock, the cost of such

borrowing could not have been passed

on by the Defendants.

37. Defendants' naked short selling and their dumping of VirnetX stock, as

alleged *infra,* was particularly nefarious because it is common knowledge that when

stock is shorted "piling in" occurs—short sellers want to short stocks that are

already being heavily shorted, further increasing the short pressure on the price of

the stock. Moreover, discovery will certainly reveal that the Defendants circulated

and marketed data concerning VirnetX and other highly shorted stocks to clients by

distributing lists of top shorted stocks. knowing that they had the ability to offer its

artificial supply. Defendants were in effect signaling to these clients that the shares

may be subject to further price declines owing to short selling which would trigger

further sales and fuel price declines. The data circulated by Defendants would include

the false, inflated short interest data concerning VirnetX and other companies which

reflected an artificial supply of stock created by Defendants causing fails-to-deliver.

38. Defendants consciously and purposefully engaged in illegal naked

short selling. That such conduct is rampant in the industry is made clear, in

part, through discovery obtained in a California case involving prime brokers

*(Overstock.Com. Inc. v. Morgan Stanley & Co. et al.,* Superior Court of California, Case No. GCG-07-460147 (Ca. Sup. Ct. 2008). Discovery in that case has shown that Merrill Lynch and Goldman Sachs knew of and intentionally engaged in naked short selling:

> With respect to **Merrill Lynch:**
>
> - Peter Melz, former president of Merrill Lynch Professional Clearing Corp ("Merrill Pro"), responded as follows to a subordinate's (Messinger) concerns about the failure to comply with short sale rules: "Fuck the compliance area—procedures, schmecedures." Exhibit 39 to Cirangle Declaration.
>
> - At oral argument, defense counsel represented: "It was common knowledge in the marketplace that Merrill Pro and GSEC [a Goldman subsidiary] were not borrowing shares for market-maker trades because we were doing it for all of our market-maker customers." Jan. 5, 2012 Tr. at 23:21–24.
>
> - Another former Merrill Pro president, Thomas Tranfaglia ("Tranfaglia"), wrote in a 2005 e-mail: "We are NOT borrowing negatives ... I have made that clear from the beginning. Why would we want to borrow them? We want to fail them." Exhibits 41, 112 to Cirangle Declaration.
>
> - In a 2006 e-mail, Tranfaglia wrote: We don't deliver mm negatives, has nothing to do with availability." Exhibits 41, 112 to Cirangle Declaration.
>
> - In a half-page e-mail, Merrill Pro's then CEO, John Brown ("Brown"), stated: I understand that we have the same issue with 369 that we had with 551 market makers. How and when can we prevent the delivery?" Tranfaglia responded: "Stop borrowing for the market-makers!" Exhibit 12 to Cirangle Declaration.
>
> - In a two-line e-mail Brown wrote his secretary: "I have a meeting at 2 with Tom T, tell him I want an update on how we're going to fix fails and I want to know what we need [sic] to do to make 369 market makers fail." Exhibit 12 to Cirangle Declaration.

- A one-page 2005 compliance procedure notes that Merrill Lynch will not borrow securities for delivery on market maker deep negative rate securities.  Exhibit 147 to Cirangle Declaration.

With respect to **Goldman:**

- Goldman's hedge fund clients remarked on how they would ask "to short an impossible name (and expecting full well not to receive it) and [be] shocked to learn that [Goldman's representative] can get it for us." Defendants' Responses, Fact 161.

- At oral argument, Goldman's counsel represented that Merrill Pro agreed to fail trades for market-making customers and stopped borrowing shares for their short sales.  Jan. 5, 2012 Tr., 23:21–28.

- A Goldman e-mail informs a large client, Wolverine Trading, that "we will let you fail" in response to an inquiry as to whether there was some effort "at cleaning up" fails.  Exhibit 7 to Sommer Declaration.

- A Goldman e-mail refers to "fails going up rather dramatically over the last few months at GSEC [Goldman's subsidiary, used for failed trades], followed by another e-mail concluding that most of the fails are for stocks that are illiquid or "trading at negative rebate with non-paying customers." Exhibit 115 to Sommer Declaration.

- A Goldman executive stated in an e-mail: "[W]e have to be careful not to link locates to fails [because] we have told the regulators we can't." Exhibit 167 to Sommer Declaration.

39.  Defendants deceived the market and regulators, and concealed their illegal naked short trading by taking affirmative steps to keep the VirnetX stock off of the Reg. SHO list (an SEC list reporting naked short sales and delivery failures) as much as possible, and thereby avoiding regulatory scrutiny and enforcement.

40.  Defendants certainly disguised naked short sales as much as possible and made them "invisible" to the system so that they didn't become fails-to-deliver which are tracked by the SEC.  Multiple methods existed and were certainly used to conceal

naked short selling of the type engaged in by Defendants, many or which were made easier to accomplish because of Defendants' relationship with the DTCC and their conducting and participating in its affairs. Such methods include but are not limited to using naked option calls as a borrowed share to keep naked shorts off the SEC's fail-to-deliver list (Rule 203, 17 CFR 242.203, imposing requirements and restrictions on short sales, does not apply to transactions in securities futures); creating false documentation of their trading; failing to complete order tickets; mis-marking order tickets; recovering shares loaned to cover for a short prior to the position being covered through the purchase of real shares, effectively allowing numerous shorts to borrow the same shares with the SHO-fail-to-deliver clock being re-set each time (and permitting the broker-dealers to charge each short for the stock loaned); moving large naked positions out of the country and returning them at a later date; re-setting the SHO fail-to- deliver clock by "rolling" large naked short positions from entity to entity, all controlled by the broker-dealer; engaging in "continuous net settlements" by which debits and credits going back and forth between broker dealers only deal with the net difference/surplus stock in a broker's account, which is loaned out to cover short sales without taking a like number of shares from the customers' individual accounts;[1] and borrowing the shares trom the buyer's margin account (the shares purchased by a short sale buyer in a margin account are immediately put into the stock lend, and then for a fee are available to cover the short sale, effectively "laundering" counterfeit shares into legitimate borrowed shares).

---

[1] Deutsche Bank Securities, Inc., for example, was caught and fined for engaging in such activity. See Financial Industry Regulatory Autority Letter of Acceptance, Waiver and Consent No. 20110273488-01.

41.  Defendants certainly concealed their fraudulent, illegal trades by "rolling" and extending the duration of the fails-to-deliver.  They did so, for example. by providing clients with information that would enable them to "sell into" buy-ins, resulting in matched trades between Defendants and their clients.  In other words, Defendants effectuated sham close-outs of fails-to-deliver by creating matching orders.

42.  Defendants' fails-to-deliver of VirnetX stock were intentional. and not due to inadvertent errors.  Defendants are motivated to intentionally fail-to-deliver stocks because doing so removes a core cost from their securities lending business—the cost of providing the security—thus allowing them to earn even more money through the charging of fees, commissions and/or interest through virtually limitless phantom securities transactions. Defendants also wanted to ingratiate themselves with their hedge fund and corporate clients, who wanted to engage in naked short sales as a tool to manipulate the market and depress the price or VirnetX stock to further their short sell strategies, and who also wanted to avoid large fees to borrow stock.

43.  VirnetX's share price was artificially depressed because of the oversupply caused by failing to settle transactions with shares issued by VirnctX. Shares issued by VirnetX are not being properly valued because of the dilutive effect of the phantom shares, which were not issued by VirnetX.

44.  Defendants' wrongful, illegal actions have resulted in substantial harm to plaintiffs and other VirnetX shareholders.  Shareholders have been harmed because the price of VirnetX stock has been artificially depressed and has declined

substantially, and because the ability of VirnetX's stock price to grow has been hindered and impaired.

## C. Defendants Illegally "Painted the Tape" and Manipulated the VirnctX Stock Price

45  Defendants have engaged in a knowing, intentional and purposeful scheme to manipulate the stock price of VirnetX by flooding the supply/offer side of the laws of supply and demand with counterfeit shares and with massive sell-offs of shares to depress the VirnetX stock price. This practice is called "painting the tape."

46.  Painting the tape is the illegal practice of making a sale for the explicit purpose or changing the stock price, usually during the final minutes of daily trading. Although painting the tape often involves stock trades designed to make a particular stock look technically attractive to the broader market, thereby allowing the manipulator to unload stock at a more favorable price, in this case Defendants engaged in the reverse practice.

47.  Defendants painted the tape and engaged and continue to engage in abusive short sale practices as a tool designed to depress the trading price of VirnetX shares, so as to profit from their short sale positions and allow their hedge fund and corporate clients to do the same. They also have painted the tape and engaged and continue to engage in numerous series of transactions involving huge "sell-offs" of shares in order to create the impression in the market that investors arc nervous about VirnetX stock and that it is trading too high, all so as to depress the price of VirnetX stock to further Defendants' short positions and those of their hedge fund and corporate clients.

48.  Painting the tape is made illegal by Section 9(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i, aimed at curbing the manipulation of securities prices.

Section 9(a) prohibits painting the tape by making it unlawful "for any person, directly or indirectly, by the use of the mails or any means or instrumentality of interstate commerce, or of any facility of any national securities exchange, or for any member of a national securities exchange to effect, alone or with one or more other persons, a manipulative short sale of any security." 15 U.S.C. § 78i(d). Section 9(a) also makes it unlawful to engage in any series of transactions "for the purchase and/or sale of any security other than a government security for the purpose or pegging, fixing, or stabilizing the price of such security in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors [such as Rule 10b-5 (Employment of Manipulative and Deceptive Practices), 17 CFR 240.10b-5]." *Id* § 78i(a)-6).

49.  Greg Wood. Vice-President of VirnetX, complained of painting the tape to the SE or painting the tape to the SEC:

> From: Greg Wood
> Sent: Thursday, Marcch 17, 2016 1:15 PM To: 'PerilloM@SEC.gov'
> Cc: Kendall Larsen
> Subject: VirnetX (VI-IC) Stock
>
> Dear Ms. Perillo,
>
> On 2/13/16 I sent you an email referencing how one of the ways our stock is being manipulated is by *painting the tape.* Today is a prime example of that. Within the last 10 minutes of today's trading session 160 thousand shares were dumped effectively bringing our stock down from average session highs.
>
> This 160 thousand share dump *in the last 10 minutes represents over 10% volume for the full trading day!*
>
> Best regards,
>
> Greg Wood
> Vice President, Corporate Communications

VirnetX Holding Corporation (NYSE Amcx: VHC) Mobile 415.505.0456 | Office 775.548.1785

50.  Defendants' "share dumping" through short selling was intended to manipulate and artificially diminish the price of VirnetX stock to benefit Defendants' short positions and those of their hedge fund and corporate clients.

51.  Defendants' painting the tape/share dumping has been rampant, as can be seen from the following few examples of trading in VirnetX stock:

**9/15/2016**    166,211 shares were traded in the last 15 minutes of trading, with 67,955 being dumped at 3:45 pm. pushing the stock down to $2.53.

**9/13/16**    110,000 shares were dumped at 3:45 pm to stop the stock's rally, and an additional 58,997 shares were sold off in the last 5 minutes of trading.

**9/9/16**    At 12:41 pm the Patent Trademark Appeal Board rendered a ruling on VimetX patents that was favorable to the company.  Almost immediately thereafter, more than 1 million shares were dumped in 30 minutes, putting YirnetX on the SHO naked short list.

**9/22/16**    120,689 shares were dumped in 2 minutes (12:51 to 12:52 pm).

**9/26/1**    49,871 shares were dumped in the first 2 minutes of morning trading. bringing the share price down from $3.15 to $2.89.

**9/26/16**    33,513 shares were dumped between 12:20 pm and 12:26 pm, bringing the stock's price down to $2.95.

**9/30/16**    At 12:27 pm, 16,970 shares were dumped so as to bring the stock's price down from $3.20 to $3.17.

**9/30/16**    At 2:19 pm, 55,464 shares were dumped, bringing the stock's price down from $3.13 to $3.07.

**9/30/16**    63,251 shares were dumped in the last 2 minutes of trading, bringing the price down from $3.11 to $3.06 as the closing price, only to be bought back 1 minute after the close in the after-market.

**10/05/16**    At 11:34 am, 60,435 shares were dumped in one minute, resulting in the stock price falling from $3.71 to $3.62.

**10/10/16**     21,815 shares were dumped in 1 minute, resulting in the stock price falling from $4.06 to $3.96.

**10/18/16**     At between 10:34 am and 10:35 am, 25,821 shares were traded on the NYSE ARCA, FINRA ADF and BATS Exchange.

**10/20/16**     At 9:40 am, 16,728 shares were dumped, resulting in the stock price falling from $3.50 to $3.29. Between 1:50 pm and 1:52 pm, 24,883 shares changed hands.

**10/27/16**     At 3:47 pm (13 minutes before the close), 32,680 shares were dumped. resulting in the stock price falling from $3.10 to $3.00.

**10/31/16**     At 3:59 pm (1 minute to close), 98.703 shares (40% of the daily volume) were dumped. resulting in the stock price falling from $3.05 to $2.95.

**11/15/16**     Of a total of 339,000 shares trading. 72,151 shares were dumped in the last 40 minutes of trading (22% of the volume to the sell side).

**11/17/16**     A block of 52,342 shares (16% of total day's volume) was dumped at 3:57 pm (3 minutes before the close), resulting in the stock price falling from $3.40 to $3.30.

**11/23/16**     At 12:52 pm, a block of 72,259 shares was dumped (all in one minute), resulting in the stock price falling from $3.25 to $3.10.

**06/14/17**  At 1:30 pm 55,000 shares were dumped, and at 2:30 pm 250,000 shares were dumped

**08/21/17**  At 10:15 a.m. 30,422 shares were dumped in one minute; at 2:50 p.m. 42,143 shares were dumped in 2 minutes, and at 3:54 p.m. 46,574 shares were dumped in 1 minute, resulting in a 9.33% decrease in the stock price.

**10/09/17**  More than 500,000 shares were dumped, halting the stock's upward momentum.

**10/13/17**  At the opening approximately 250,000 shares were dumped in approximately 5 minutes.  More than 300,000 shares were dumped in the first 15 minutes of trading bringing the stock down to $7.75 from $8.25 per share.  At 2:30 pm, an additional 250,000 shares were dumped (bringing the stock down to $6.20 (a 25% decline)), and the stock ultimately closed at $7/share (down 15%)

**10/16/17**  After a key decision was rendered awarding the company over $400 million in damages, more than 556,000 shares were sold in the subsequent 15 minutes, dropping the price to $6.65 from $8.20.

**10/17/17**   In the first 30 minutes of trading 250,000 shares were dumped.

**10/18/17**   At 2:31 pm 151,000 shares were dumped, and by the end of the day over 426,000 shares had been dumped bringing the stock down to $5.10/share from its high in the day of $5.93.

**10/20/17**   From 9:51 a.m. until 9:55 a.m. 104,285 shares were dumped, bringing the stock down to $5,05 from $5.60.

52.  Defendants' illegal attack on VirnetX stock and their manipulation of the stock to artificially depress its price has been and continues to be highly successful. Defendants are good at what they do—illegal naked shorting and market manipulation/the fixing of stock prices. Indeed, the price of VirnetX stock has tumbled even though the market has moved up, and even though VirnetX has had great success in its litigation against Apple, in that YirnetX has been awarded over $400 million in patent litigation against Apple and can expect an award of ongoing royalties and further relief.

53.  Defendants are so good at naked short selling and dumping shares to manipulate the market that even after a federal court decision was handed down on October 13, 2017 awarding VirnteX over $400 million in damages, Defendants were able to prevent the stock price from soaring by naked short selling and dumping shares on October 16, 17 and 18 and thereafter.

## DAMAGE TO VIRNETX SHAREHOLDERS

54.  ViirnetX currently has a market capitalization of approximately $181 million. With a current share price of $5.70, YirnetX has approximately 57 million shares on the market. The number or shares on the market has remained relatively constant since February 1, 2013, and the holders of VirnetX shares have seen the price of VirnetX stock fall from $35.23 per share on February 1, 2013 to $23.69 per share on April 30, 2013, to $17.61 per share on May 31, 2014, to $7.55 per share on Feburary 1, 2015, and to $4.49 per share on March 31, 2016. As of December 3, 2016, the price of VirnetX stock was $3.15.

55. But for the Defendants' illegal conduct involving illegal short selling and market manipulation of VirnetX' stock price, the price of YirnetX stock would not have fallen but would have substantially risen from its $35.23 per share level on February 1, 2013. Indeed, it had been expected that without any market manipulation by Defendants the price would rise to the $60 range.

56. As a direct result of Defendants' naked short selling and manipulative scheme to depress the price of VirnetX stock through painting the tape and dumping large blocks of stock at key moments, each VirnetX share has lost approximately $32.03 of value since February 1, 2013. Each share has **also** lost the "upside" to the $60 range that would have been realized but for Defendants' illegal, fraudulent conduct. Hence, the holder of each of the 57 million VirnetX shares on the market has been damaged in that at least $56.80 of value attributable to each share has been lost.

57. Based upon the failure to reach expected price levels and the diminution in the price of VirnetX stock due to Defendants' illegal conduct, the market capitalization of VirnetX has been virtually destroyed. Given the amount of outstanding VirnetX stock held by shareholders, actual damage to plaintiffs and putative Class members by way of lost value concerning their shares of VirnetX stock, and the amount in controversy in this action, is over $3.24 billion. This amount must be trebled, given Defendants' violation of the Racketeer Influenced Corrupt Organizations Act, making the amount in controversy over $9.72 billion.

## CLASS ACTION ALLEGATIONS

58. Plaintiffs bring this suit individually and as a class action on behalf of others similarly situated pursuant to Rule 23 of the Federal Rules of Civil

Procedure.  Subject to additional information obtained through further investigation and/or discovery, the definition of the Class may be expanded or narrowed.

59.  The proposed Class consists of all persons or entities who at any point between February 1, 2013 and the filing of this first amended complaint held a share of VirnetX common stock.

60.  This action has been brought and may properly be maintained as a class action pursuant to New Jersey Court Rule 4:32.  Plaintiff's claims are typical of those of the class members, as all are based upon the same facts and legal theories.

61.  The Class has a well-defined community interest in the litigation:

**Numerosity:** The members of the Class are so numerous that joinder of all members is impracticable.  The Class is believed to be comprised of persons or entities who held VirnetX stock throughout the United States at any point from February 1, 2013 through the date of the filing of this first amended complaint. The identities of all class members are readily ascertainable from the VirnetX shareholder register, and are estimated to total approximately 5,000 persons or entities.

**Commonality:** Common question of law and fact exist as to all members of the Class. These common questions predominate over questions affecting only individual Class members, and include:

    a.  Whether Defendants engaged in naked short selling of VirnetX stock so as to damage all VirnetX shareholders.

    b.  Whether Defendants manipulated the market price of VirnetX stock by shorting and dumping shares so as to intentionally and artificially depress the stock value and thereby damage all VirnetX shareholders.

    c.  Whether Defendants conducted or participated in the affairs of the DTCC through a pattern of racketeering activity and thereby damaged all VirnetX shareholders.

    d.  Whether Defendants conspired to violate RICO and thereby damaged all VirnctX shareholders.

    c.  Whether Defendants were unjustly enriched at the expense of all

VirnetX shareholders.

t. Whether Defendants intentionally interfered with the prospective economic benefit and contract rights of all VirnetX shareholders.

g.  Whether Defendants engaged in a civil conspiracy and thereby damaged all VirnetX shareholders.

h.  Whether Defendants committed common law fraud and thereby damaged all VirnctX shareholders

l.  Whether Defendants' illegal conduct depressed the value of VirnetX common stock, causing damage to all VirnetX shareholders.

**Typicality:**  Plaintiffs' claims are typical of the claims of the members of the Class. Plaintiffs and all members of the Class have claims arising out of the Defendants' common uniform course of conduct complained of herein.

**Adequacy:**  Plaintiffs will fairly and adequately protect the interests of the Class members insofar as plaintiffs have no interests that are adverse to the absent Class members. Plaintiffs are committed to vigorously litigating this matter. Plaintiffs have retained counsel experienced in commercial and securities litigation, complex legal issues, and class actions. Neither plaintiffs nor their counsel have any interests which might cause them not to vigorously pursue the instant class action lawsuit.

**Superiority:**  A class action is superior to the other available means for the fair and efficient adjudication of this controversy because individual joinder of all members would be impracticable. Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum efficiently and without unnecessary duplication of effort and expense that individual actions would engender.

62. Based upon discovery and further investigation, plaintiffs may move for class certification using modified definitions of the Class, Class Claims, and the Class Period, or seek class certification only as to particular issues.

## COUNT ONE

### (VIOLATION OF THE RACKETEER INFLUENCED CORRUPT ORGANIZATIONS ACT—§ 1962(C) VIOLATION)

63. Defendants have violated the Racketeer Influenced Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*

64. Defendants are RICO "persons" as that term is defined by 18 U.C.S. § 1961(3). They were employed by or associated with the RICO enterprise, and were part of the enterprise's upper management. Defendants made important decisions, and controlled many aspects of the enterprise's affairs and the way it conducted business.

65. The DTCC is a RICO "enterprise" as defined by 18 U.S.C. § 1961(4). This enterprise at all relevant times had a continuity of structure and personnel; a common or shared purpose: and an ascertainable structure distinct from that inherent in the pattern of racketeering, in that the enterprise engaged in acts separate and apart from the pattern of racketeering. The activities of the enterprise affected interstate commerce and commerce within the State of New Jersey.

66. In violation of 18 U.S.C. § 1962(C), Defendants conducted, participated in, operated and/or managed the affairs of the DTCC enterprise through a pattern of racketeering activity, as that term is defined by 18 U.S.C § 1961(5).

## A. RICO Predicate Acts of Racketeering

67. The predicate acts forming the pattern or racketeering activity began at least as early as February 1, 2013, if not earlier, and are continuing. They were committed as part of Defendants' scheme to naked short sell shares of VirnetX stock without having to provide VirnetX shares on the settlement date, and to manipulate the market and depress

the price of VirnetX stock so as to reap huge gains on their short selling strategies and those of their hedge fund and corporate clients by painting the tape and dumping VirnetX stock.

68.  The predicate acts through which Defendants' scheme was accomplished consist of multiple violations of Federal Securities Laws and of federal mail and wire fraud statutes.

69.  By selling VirnetX stock short at times when they neither possessed nor intended to obtain VirnctX stock to deliver by the settlement date and by creating and trading in unauthorized, fictitious, and/or counterfeit VirnetX shares, and by dumping VirnetX stock at key times so as to artificially depress its price to further Defendants' short sell strategies and ultimately those of their hedge fund and corporate clients, Defendants committed a fraud in connection with the sale and purchase of securities nationwide, including New Jersey.

70.  Given Regulation SHO prohibiting naked short sales. the naked short sales engaged in by Defendants are predicate RICO acts and illegal under Section 10 of the Securities Exchange Act of 1934, I5 U.S.C. § 78j(a).  That section provides, in relevant part, that it is unlawful to effectuate a short sale in connection with the purchase or sale of any security in contravention of rules and regulations promulgated by the SEC.  The naked short sales engaged in by Defendants violated SEC Regulation SHO and were illegal predicate acts.

71.  The naked short sales engaged in by Defendants violated SEC Rule 203, 17 CFR 242.203, dealing with short sales.  Rule 203(b) provides that a broker-

dealer cannot accept a short sale order unless it has "Borrowed the security, or

entered into a bona-fide arrangement to borrow the security," or has "[rleasonable

grounds to believe that the security can be borrowed so that it can be delivered on

the date delivery is due." The naked short sales engaged in by

Defendants violated SEC Rule 203, and were predicate acts.

72. Painting the tape, as was done by Defendants, is made illegal by Section

9(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78i. Section 9(a) makes it

unlawful "for any person, directly or indirectly, by the use of the mails or any means or

instrumentality of interstate commerce, or of any facility of any national securities

exchange, or for any member of a national securities exchange to effect, alone or with one

or more other persons, a manipulative short sale of any security." 15 U.S.C. § 78i(d). It

also makes it unlawful to engage in any series or transactions "for the purchase and/or sale

of any security other than a government security for the purpose of pegging, fixing, or

stabilizing the price of such security in contravention of such rules and regulations as the

Commission may prescribe as necessary or appropriate in the public interest or for the

protection of investors [such as Rule 10b-5 (Employment of Manipulative and Deceptive

Practices), 17 C.F.R. 240.10b-5]." *Id* § 78i(a)-6). Defendants violated these provisions and

engaged in predicate acts.

73. Naked short selling and painting the tape, as was done by Defendants. also

violated Rule 10b-5 (Employment of Manipulative and Deceptive Practices), 17 C.F.R.

240.10b-5, promulgated under Section 10(b) of the Securities Exchange Act of 1934. By

naked short selling VirnetX stock and by dumping blocks of VirnctX stock at key times to

intentionally and artificially create negative market sentiment and thereby drive down the price of VirnetX stock, Defendants used the facilities of one or more national securities exchanges and employed "a device, scheme or artifice to defraud" and engaged "in any act, practice, or course or business which operates or would operate as a fraud or deceit upon any person."

74. Defendants also utilized and caused to be utilized the wires and mail to perpetrate, conceal and cover up their fraudulent scheme in violation of 18 U.S.C. §§ 1341 and 1343. The wires and/or mail were used on, *inter alia*, the following dates:

12/09/16 to effectuate naked shorting
12/12/16 to effectuate naked shorting
12/13/16 to effectuate naked shorting
12/14/16 to effectuate naked shorting
03/23/17 to effectuate naked shorting
05/04/17 to effectuate naked shorting
06/14/17 to effectuate naked shorting
06/29/17 to effectuate naked shorting
07/17/17 to effectuate naked shorting
08/11/17 to effectuate naked shorting
08/15/17 to effectuate naked shorting
10/13/17 to effectuate naked shorting
10/16/17 to effectuate naked shorting
10/17/17 to effectuate naked shorting
10/18/17 to effectuate naked shorting
10/19/17 to effectuate naked shorting
10/20/17 to effectuate naked shorting

9/15/16 to effectuate manipulative dumping
9/13/16 to effectuate manipulative dumping
9/9/16  to effectuate manipulative dumping
9/22/16 to effectuate manipulative dumping
9/26/16 to effectuate manipulative dumping
9/26/16 to effectuate manipulative dumping
9/30/16 to effectuate manipulative dumping
9/30/16 to effectuate manipulative dumping
9/30/16 to effectuate manipulative dumping
10/05/16 to effectuate manipulative dumping
10/10/16 to effectuate manipulative dumping
10/18/16 to effectuate manipulative dumping

10/20/16 to effectuate manipulative dumping
10/27/16 to effectuate manipulative dumping
10/31/16 to effectuate manipulative dumping
11/15/16 to effectuate manipulative dumping
11/17/16 to effectuate manipulative dumping
11/23/16 to effectuate manipulative dumping
06/14/17 to effectuate manipulative dumping
08/21/17 to effectuate manipulative dumping
10/09/17 to effectuate manipulative dumping
10/13/17 to effectuate manipulative dumping
10/16/17 to effectuate manipulative dumping
10/17/17 to effectuate manipulative dumping
10/18/17 to effectuate manipulative dumping
10/20/17 to effectuate manipulative dumping

75. The Defendants' conduct, along with their commission of predicate acts forming a pattern of racketeering activity, has come close to destroying VirnetX as a company. The effects of a drastic diminution of a company's capitalization due to a decrease in its stock price can be devestating. Injury to the company occurs because a drop in a company's capitalization/stock price can destroy or extremely diminish its ability to obtain outside financing to fund operations through stock offerings or otherwise increase the company's cost of borrowing; it undermines employee retention, especially where stock options are used to retain employees; and it erodes customer confidence in the company. Needless to say, the destruction of VirnetX' capitalization through the decrease of the VirnetX stock price also was devastating to shareholders.

76. Apart from destroying companies and injuring shareholders in order to reap even more profits, and among other effects flowing from Defendants' illegal conduct and their commission of predicate acts as part of a pauern of racketeering activity, all of which violated securities laws and federal mail and wire fraud statutes, the artificially high short interest caused by naked short selling and the dumping of stock

was reported to the marketplace as bona fide short interest. Hence, Defendants injected false information into the marketplace for VirnetX securities in the form of artificially high short interest figures for VirnetX stock so that market participants would be induced to view the stock more negatively, creating downward price pressure on the stock. With high negative rebate stocks. the short interest is additionally signaling a negative sentiment that is so strong that the short seller is willing to bet against the stock even given the high cost of the negative rebate.

**B. The RICO Enterprise**

77. The DTCC is a powerful unregulated corporate institution that monopolizes the clearance and settlement of all United States securities transactions. It is a private, closely held enterprise which actively and aggressively fights all efforts to obtain information regarding naked shorting. It controls virtually all of the U.S. trade clearance and settlement processing or stock issued by corporations that is held in brokerage accounts. Almost all securities trades today are conducted electronically through the DTCC via electronic book entries.

78. The DTCC operates the DTCC stock borrow program, which has a massive lending pool of shares from brokers' client margin accounts from which stock for short sales can be borrowed and then replaced.

79. Defendants are intimately involved in the control and management of the DTCC, and they have significant involvement, communication with and influence over the DTCC. For example, they act as DTCC member clearing firms. meaning that they are

informed by the DTCC of the clearing and settling of trades so that they can purportedly assure that paperwork associated with the securities transactions is accurate.

80.   The DTCC and its members operate with a common purpose of, *inter alia,* facilitating securities transactions and clearing and processing the settlement of stock transactions, and of promoting the stability and certainty of global financial markets. The DTCC has an ongoing organization and it functions as a continuing unit; it has functioned for over 40 years.   The DTCC is governed by a Board of Directors which is currently composed of approximately 20 Directors.   Of these, approximately 12 are representatives of clearing agency participants, including international broker/dealers, custodian and clearing banks, and investment institutions; four are independent non-participant Directors; two Directors are designated by DTCC's preferred shareholders, NYSE Euronext and FINRA; and the remaining two Board members are DTCC's Non-Executive Chairman and its President and Chief Executive Officer.

81.   The DTCC has an ascertainable structure.   This is made clear by the DTCC's April, 2016 Capital Management Statement, annexed as **Exhibit** I and incorporated herein, and by its Consolidated Financial Statements as of and for the Years Ended December 31, 2015 and 2014, and Independent Auditors' Report, annexed as **Exhibit J** (w/o notes) and incorporated herein.

82.   There is a clearly defined structure, division of labor and separation or functions within the DTCC organization.   The affairs of the DTCC are organized, managed, directed, conducted, and participated in, directly or indirectly, by brokers such as the John Doe Defendants, who were associated with the DTCC enterprise on a high, managerial and supervisory level, and who had the ability to participate in its

affairs and who did so. The Directors of the DTCC include key high-level executives of

the market maker brokers, most of whom undoubtedly will be found to consist of the John

Doe Defendants:

> Phil Davies — Managing Director and Global Head of Operations of MorganStanley.

> Darryl Henricks — Americas Regional Operating Officer of USB Investment Bank.

> Paul Simson — Managing Director and Global Head of Equity Asset Management Services of Bank or America Merrill Lynch.

> Paul Walker — Co-Head of the Technology Division of Goldman Sachs.

> Lori Hricik — Former CEO and Head or JP Morgan Treasury Services.

> Suni P. Harford — Managing Director of Citigroup.

> Lester Owens — Managing Director of JP Morgan

The Management of the DTC includes:

> Michael C. Bodson, President--formerly part of Morgan Stanley Senior Management for 20 years.

> Robert Garrison. Managing Director and Chief Information Officer — formerly senior executive at Morgan Stanley for 25 years.

> Andrew Gray. Managing Director, Group Chief Risk Officer — formerly Merrill Lynch managing director for 10 years.

83. The DTCC enterprise exists separate and apart from the pattern of racketeering

in which the Defendants engaged. As its Consolidated Financial Statements (Exhibit A)

show at page 4, the enterprise derives revenue from settlement and asset services,

clearing services, data services, repository services, investment product services and other

services. Its activities are not solely related to the pattern of racketeering activity engaged in by Defendants.

## C. Defendants Conducted or Participated in the Affairs of the Enterprise through a Pattern of Racketeering Activity

84. Although Defendants conducted or participated in a wide range of the DTCC enterprise's affairs, a part of the DTCC enterprise's affairs—that relating to the clearing of short sales and of lending against short sales—was conducted or participated in, directly or indirectly, by Defendants through a pattern of racketeering. The DTCC was utilized to effectuate naked short sales and to paint the tape and manipulate the market and the price of VirnetX stock by dumping huge blocks of stock. As concerns VimetX, Defendants utilized, conducted or participated in the affairs of the DTCC, directly or indirectly, to clear illegal naked short selling and shares being dumped on the market since at least as early as February 1, 2013, and Defendants' wrongful and illegal conduct continues today. Defendants also utilized the DTCC to disguise and hide their illegal conduct from regulators. The DTCC benefitted from Defendants' illegal conduct, because it charged interest, fees and commissions relating to Defendants' short sales and its loaning of shares—whether they were legitimate or phantom/counterfeit shares.

85. The incidents of racketeering activity engaged in by Defendants embrace criminal conduct that has the same or similar purposes, results, participants, victims and methods of commission. The victims were always investors in VirnetX and VirnetX itself; the purpose was always to reap huge fees and profits; the results were always to line Defendants' pockets at the expense of VirnetX and its shareholders; the participants were always the Defendants and their clients; and the methods of commission were always to fail-to-deliver or to massively dump VirnetX stock at key times, thereby maintaining an

artificial downward pressure on the stock price. The predicate acts were not isolated incidents but were all related, and present continuity and a threat of continued continuity. Indeed, Defendants to this day continue to engage in their illegal predicate acts.

86. Defendants did not limit the commission of their predicate acts to one fraudulent scheme or pattern or racketeering. Defendants engaged in multiple other similar schemes and patterns of racketeering activity over a period of many years concerning other public companies and shareholders who they injured. as a way of doing business. For example, discovery will undoubtedly show that the John Doe Defendants engaged in similar illegal conduct concerning Overstock.Com, Inc. *(see Overstock.Com. Inc. v. Morgan Stanley & Co.. et al.* Superior Court of California, Case No GCG-07-460147 (Ca. Sup. Ct. 2008) (dismissed for lack of jurisdiction)). Indeed, as alleged *supra*, prime brokers such as the John Doe Defendants have been fined by FINRA for violating Regulation SHO, for "supervisory failures," for submitting inaccurate data to FINRA and failing to submit required data, and for related wrongful conduct.

## d. Defendants' Activities Affected Interstate Commerce

87. Defendants operate on a national—indeed, an international—level. Defendants conduct business in and their activities affect interstate and foreign commerce, in that they trade securities globally and effectuate securities transactions throughout the United States and the world. Defendants all engaged in trade or commerce in New Jersey. or in activities that affected trade or commerce in New Jersey. Indeed, Defendants were all registered to do business and generally conducted business in New Jersey.

## c, Injury to Plaintiffs and the Putitive Class Members

88. As a direct and proximate result of the RICO violations, plaintiffs and the putative Class members have been injured by the defendant RICO persons and have suffered actual damage to their business or property in an amount in excess of $3.24 billion.

Pursuant to 18 U.S.C. §1964(c), plaintiffs and the putative Class members are entitled to judgment against the RICO defendants for threefold such actual damages and interest, plus an award of attorneys' fees and costs.   Hence, they are entitled to judgment in an amount exceeding

$9.72 billion.

## COUNT TWO
### (CONSPIRACY TO VIOLATE RICO—§ 1962(d) VIOLATION)

89.  Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

90.  Defendants conspired with their clients and the DTCC to violate RICO in violation of 18 U.S.C. § 1962(d), all in an effort to earn lofty fees and commissions and to ingratiate themselves to their hedge fund and corporate clients.

91.  Each defendant RICO person was a co-conspirator that knowingly joined the conspiracy and involved itself, directly or indirectly, in the commission of at least two predicate offenses of securities violations and of federal mail and wire fraud statutes.

92.  The goal and purpose of the conspiracy was for the Defendants to reap huge fees, commissions and interest; for Defendants to ingratiate themselves to their hedge fund and corporate clients by effectuating illegal naked short sales and painting the tape and dumping VirnetX shares to effectuate short sale strategies; for the DTCC to earn huge fees, commissions and interest; and for Defendants' clients

to avoid paying large fees to borrow stock in connection with legitimate short sales, and to further their short sale strategies.

93. Each Defendant was aware or its role as a co-conspirator.

94. Defendants and their co-conspirators knowingly participated in the scheme that injured plaintiffs and the putative Class members, and knowingly committed numerous predicate acts as part of and in furtherance of the conspiracy in violation of 18 U.S.C. § 1962(d).

95. As a result of the conspiracy, plaintiffs and the putative Class members were injured and damaged in an amount in excess of $3.24 billion. Pursuant to 18 U.S.C. § 1964(C), plaintiffs and the putative Class members are entitled to judgment against the RICO defendants for three fold such actual damages and interest, plus and an award of attorneys' fees and costs. Hence, plaintiffs and the putative Class members are entitled to judgment in an amount exceeding $9.72 billion.

## COUNT THREE
## (UNJUST ENRICHMENT)

96. Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

97. Defendants knew that their naked short selling of VirnetX stock, and their manipulation of the price of VirnetX stock by painting the tape and dumping blocks of VirnctX stock at key times so as to create negative market sentiment and artificially depress the price of VirnetX stock. would directly and negatively impact upon the value of the VirnetX stock held by plaintiffs and the putative Class members while providing Defendants with huge profits.

98.  Defendants unlawfully enriched themselves at the expense of plaintiffs and the putative Class members through their wrongful, illegal. fraudulent conduct and scheme, such that retention of those profits would be inequitable.

99.  As a result of Defendants' unlawful and illegal actions and their wrongfull, illegal, fraudulent conduct and scheme, plaintiffs and the putative Class members have been damaged.

## COUNT FOUR
## (INTENTIONAL INTERFERENCE WITH ECONOMIC ADVANTAGE)

100.  Plaintiffs repeat and reallcge the prior allegations as if fully set forth at length herein.

101.  Plaintiffs and the putative Class members had a reasonable expectation or economic advantage or benefit as a result of their acquisition of VirnetX stock.

102.  Defendants knew, or should have known, of the expectancy of economic advantage through ownership of Virnct X stock by plaintiffs and the putative Class members.

103.  Defendants' conduct in naked short selling VirnetX stock, and in manipulating the price of VirnetX stock by painting the tape and dumping blocks of VirnetX stock at key times so as to create negative market sentiment and artificially depress the price or VirnetX stock, was illegal and wrongful and was undertaken without justification.

104.  The expectation of economic advantage or benefit on the part of plaintiffs and the putative Class members was impaired to their substantial detriment.  But for

Defendants' wrongful and illegal conduct, it is reasonably likely that plaintiffs and the putative Class members would have realized their economic advantage or benefit.

105.  Plaintiffs and the putative Class members have been damaged by Defendants' wrongful and illegal conduct in an amount exceeding $3.24 billion.

## COUNT FIVE
## (INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS)

106.  Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

107.  The purchase of VirnetX shares by plaintiffs and the putative Class members was undertaken pursuant to a contract.

108.  Defendants knew, or should have known of the existence of the contractual relationship.

109.  Through their naked short selling of VirnetX stock, and their manipulation of the price of VirnetX stock by painting the tape and dumping blocks of VirnetX stock at key times so as to create negative market sentiment and artificially depress the price of VirnetX stock, Defendants interfered with plaintiffs' contractual rights and relations, and acted intentionally and maliciously and without justification, knowing of the harm that would ensue to plaintiffs and the putative Class members.

110.  Defendants acted so as to profit and enhance their financial position, and in doing so their illegal and wrongful conduct went far beyond and transgressed generally accepted standards of morality and socially acceptable conduct.

111.  As a direct result of Defendants' wrongful and illegal actions. plaintiffs and the putative Class members have been damaged in an amount exceeding $3.24 million.

## COUNT SIX
## (COMMON LAW FRAUD)

112.  Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

113.  In purchasing VirnetX stock, plaintiffs and the putative Class members reasonably relied upon the integrity of the securities markets.

114.  Defendants knew, or should have known, that purchasers of VirnetX stock were relying upon the integrity of the securities markets.

115.  In naked short selling VirnetX stock, and in painting the tape and dumping huge blocks of VirnetX stock at key moments to manipulate the market and cause negative market sentiment so as to artificially decrease the price of VirnetX stock, Defendants knowingly acted wrongfully, illegally and fraudulently.

116.  Defendants knew, or should have known, that their conduct was wrongful, illegal and fraudulent.

117.  Defendants knew that each time that they effectuated a trade of YirnetX stock they were impliedly and falsely representing to the market and the plaintiffs and putative Class members that the trade was legal and not wrongful, and they intended that the market rely upon such false representations, including plaintiffs and the putative Class members. Defendants knew that each time that they effectuated a wrongful and illegal VirnetX trade without disclosing the wrongful and illegal nature of their conduct, they were failing to disclose material facts.

118.  As a result of Defendants' fraudulent conduct, plaintiffs and the putative Class members have suffered damage in an amount exceeding $3.24 million.

## COUNT SEVEN
## (CIVIL CONSPIRACY)

119.  Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

120.  Defendants conspired with their clients and the DTCC to commit and process their unlawful, illegal acts.

121.  An agreement existed between Defendants, their clients and the DTCC to illicit a wrong or injury upon VirnctX, the plaintiffs and the putative Class members, and the market in general.  The purpose and goal or this agreement was for the Defendants and the DTCC to reap interest, fees and commissions, for the Defendants to ingratiate themselves with their hedge fund and corporate clients by engaging in naked short sales and painting the tape and dumping huge blocks of VirnetX stock and thereby artificially depressing its price to further short sale strategics, and for Defendants' clients to avoid paying hefty prices in connection with the legally required borrowing of stock to cover short sales, and for Defendants' clients to manipulate the market and the price of VirnetX stock to further their short sale strategies.

122.  In connection with their agreement, Defendants, their clients and the DTCC engaged in numerous overt acts as alleged *supra,* all of which resulted in damage to plaintiffs and the putative Class members in an amount exceeding $3.24 million.

## COUNT EIGHT
## (AIDING AND ABETTING
## L I ABILITY)

123.  Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

124. Defendants committed primary RICO violations and are primarily liable as concerns the common law claims of plaintiffs and the putative Class members (collectively, the "Primary Violations"). Alternatively, and in addition thereto, Defendants aided and abetted their hedge fund and corporate clients who are as yet unknown in committing Primary Violations.

125. Defendants had knowledge of the Primary Violations and knowingly provided substantial assistance to their hedge fund and corporate clients in committing Primary Violations.

126. Plaintiffs and the putative Class members were injured by Defendants' aiding and abetting their hedge fund and corporate clients in committing Primary Violations in an amount exceeding $3.24 billion. Because Defendants aided and abetted the commission of RICO violations, plaintiffs and the putative Class members are entitled to judgment in an amount exceeding $9.72 billion.

## COUNT NINE
### (PUNITIVE AND EXEMPLARY DAMAGES)

127. Plaintiffs repeat and reallege the prior allegations as if fully set forth at length herein.

128. Each Defendant's actions was undertaken wilfully. wantonly and maliciously.

129. Each Defendant's actions was wrongful and illegal, and shocks the conscience and all standards of ethics, morality and socially acceptable conduct.

130. Plaintiffs and the putative Class Members were damaged by Defendants' conduct.

**WHEREFORE,** plaintiffs and the putative Class Members demand judgment against Defendants, jointly and severally, as follows:

(a)  For an order certifying that this action may be maintained as a Class

pursuant to Federal Rule of Civil Procedure 23, and appointing plaintiffs

and the undersigned counsel to represent the Class as previously set forth

and defined above;

(b)  for an award of compensatory damages on all Counts.

(c)  For an award of treble damages and interest, and attorneys' fees and costs, on

Counts One, Two and Eight.

(d)  For an award of punitive damages on Counts Six, Seven, Eight and

Nine.

(e)  For attorneys' fees, litigation expenses and costs.

(f)  For pre- and post- judgment interest.

(g)  For such other and further relief as may be just and proper.

**GUARINO & CO. LAW FIRM, LLC**
26 Park Street, Suite 2057
Montclair, NJ 07042
973/509-628
guarinolaw@gmail.com
Attorneys for Plaintiff

Dated:  October 20, 2017                                    BY: _____

Philip L. Guarino

## DEMAND FOR TRIAL BY JURY

The undersigned demands a trial by jury of all issues so triable.

> **GUARINO & CO. LAW FIRM, LLC**
> 26 Park Street. Suite 205
> Montclair, NJ 07042
> 973/509-628
> guarinolaw@gmail.com
> Attorneys for Plaintiffs
>
> BY: _____
>      Philip L. Guarino

Dated: October 20, 2017

## CERTIFICATION

The undersigned certifies that, to the best of his knowledge:

1. The matter in controversy is not the subject of any other action or proceeding in any Court, or of a pending arbitration proceeding.

2. No other action or arbitration proceeding is contemplated concerning the matter in controversy.

3. There are no other parties who should be joined in this action.

S/Philip L. Guarino, Esq.